UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| RICHARD FRAME, WENDELL DECKER, SCOTT UPDIKE, JUAN NUNEZ, a minor, by his next friend and mother, GABRIELA CASTRO, MARK HAMMAN and JOEY SALAS, | §<br>§<br>§<br>§<br>§<br>§ | |
| Plaintiffs, | §<br>§ | |
| v. | §<br>§ | Civil Action No. 4-05CV-470-Y |
| THE CITY OF ARLINGTON, a Municipal Corporation, | §<br>§<br>§ | |
| Defendants. | §<br>§ | |

**FOURTH AMENDED COMPLAINT[1]**

Plaintiffs, RICHARD FRAME; WENDELL DECKER; SCOTT UPDIKE; JUAN

NUNEZ, a minor, by his next friend and mother, GABRIELA CASTRO; MARK

HAMMAN; and JOEY SALAS (collectively, the "Plaintiffs"); sue Defendant, CITY OF

ARLINGTON, and allege:

1.    On July 26, 1990, the Americans with Disabilities Act ("ADA"), 42 U.S.C.

§§ 12101, *et seq.*, was enacted and established the most important civil rights law for

people with disabilities in our country's history.  Congress explicitly stated that among

the purposes of the ADA are:

A.    "to provide a clear and comprehensive national mandate for the

elimination of discrimination against individuals with disabilities,"

---

[1] The Fourth Amended Complaint includes three (3) additional plaintiffs: Juan Nunez, a minor, by his next friend and mother, Gabriela Castro, in new paragraphs 21 and 27; Mark Hamman, in new paragraphs 22 and 28-29; and Joey Salas, in new paragraphs 23 and 30-31.  No other substantive changes have been made.

B.    "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities," and

C.    "to provide the sweep of congressional authority, including the power to enforce the 14th Amendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people--e with disabilities."  42 U.S.C. § 12101(b).

2.    In passing the ADA, Congress identified some 43,000,000 Americans as having one or more disabilities.  42 U.S.C. § 12101(a)(1).  Congress found that, historically, society tended to isolate and segregate individuals with disabilities, and despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem.  42 U.S.C. § 12101(a)(2).

3.    Congress also found that discrimination against individuals with disabilities persists in such critical areas as housing, institutionalization, and access to public services.  42 U.S.C. § 12101(a)(3).

4.    The ADA has a clear and comprehensive nationals mandate to eliminate discrimination against individuals with disabilities and to establish clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities.  42 U.S.C. § 12101(b)(1)(2).

5.    To further ensure a comprehensive and uniform federal law, the ADA preempts state and local laws unless those laws provide protection for the rights of individuals with disabilities that is greater than, or equal to, the protection afforded by the ADA.  42 U.S.C. §§ 12131-12134; 28 C.F.R. §§ 35.101, *et seq.*

6.      The City of Arlington ("Arlington") has discriminated against the Plaintiffs by failing to properly install or maintain curb ramps where sidewalks intersect with vehicular ways, when resurfacing, repairing, and/or altering city streets and/or sidewalks in violation of the ADA.  Certain intersections in Arlington either have no curb ramps whatsoever, or contain non-compliant curb ramps that constitute a hazard when persons with mobility impairments attempt to travel between sidewalks and streets.

7.      Arlington has also discriminated against the Plaintiffs by failing to maintain accessible pedestrian rights-of-way as required by the ADA.  For example, many sidewalks contain abrupt vertical changes in level violations, excessive cross slopes, and/or protruding objects which make travel dangerous if not impossible for the mobility impaired.  This failure prohibits people with mobility impairments from being able to travel safely and independently along such pedestrian rights-of-way within Arlington.

8.      Arlington has also discriminated against the Plaintiffs by failing to provide a sufficient number of handicap parking spaces or fully compliant handicap parking spaces in certain public facilities described *infra*.

9.      The Plaintiffs in this action challenge Arlington's failure to properly design and install curb ramps when constructing, resurfacing, or altering city streets and sidewalks, as well as Arlington's failure to provide program access to pedestrian rights-of-way.  These actions are in violation of the ADA, and Section 504 of the Rehabilitation Act of 1973, which require public entities and entities receiving federal funds to provide equal access to public services for the disabled.

10.     The Plaintiffs in this action also challenge Arlington's failure to maintain accessible routes along the City's pedestrian rights-of-way in violation of the ADA, and

Section 504 of the Rehabilitation Act of 1973, which require public entities and entities receiving federal funds to provide equal access to public services for the disabled.

11.     Plaintiffs include individuals with mobility impairments who require the use of a wheelchair or motorized scooter to travel along pedestrian rights-of-way.  Such use requires compliant curb ramps so Plaintiffs can use the pedestrian rights-of-way to travel to and from their desired destinations of travel without being required to travel in streets often against oncoming traffic, and/or traverse over hazardous and unsafe curb ramps.  In order to have the safe and navigable use of sidewalks in Arlington, Plaintiffs also require properly maintained pedestrian rights-of-way that are free from abrupt vertical changes in level of over ¼ inch (1/2 inch if the change in level is beveled). Plaintiffs also require the removal of dangerous and excessive cross slopes and obstacles or protruding objects that narrow and prohibit the path of travel.

12.     This action also challenges Arlington failure to provide proper curb ramps at all streets and roadways under the control and responsibility of Arlington including but not limited to, city owned streets and county and/or state roadways within Arlington for which Arlington has maintenance responsibilities.

13.     The action also challenges Arlington's failure to properly maintain pedestrian rights-of-way under the responsibility and control of Arlington, including but not limited to sidewalks and crosswalks serving city owned streets and county and/or state roadways with Arlington for which Arlington has maintenance responsibilities. Many, if not all, of the streets at issue, including relevant portions of Abram, Border, Bowen, South, and Mesquite, were substantially resurfaced, reconstructed, repaved, and otherwise altered by or on behalf of Defendant either within the last two years or after 1992.

## JURISDICTION AND VENUE

14.     This action is brought by the Plaintiffs to enforce Title II of the ADA, 42 U.S.C. §§ 12131-12134, and its implementing regulation, 28 C.F.R. part 35, as well as § 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 701, *et seq.* ("the Rehabilitation Act").

15.     This Court is vested with original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

16.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), as the events complained of occurred within this district and division.

## THE PARTIES

17.     Arlington in a Texas municipal corporation which has been given the authority to install, repair, and maintain streets and sidewalks within Arlington, including the installation, repair and maintenance of curb ramps.  Arlington is a public entity within the meaning of Title II of the ADA, which is defined as any state or local government or any department or agency of a state or local government.  42 U.S.C. § 12131(1)(a)-(b).

18.     Plaintiff Richard Frame ("Mr. Frame") resides at 6209 Arrowwood Drive in Arlington, Texas, and travels within Arlington to conduct business and/or other routine daily activities as further described *infra.* Mr. Frame is a quadriplegic and requires the use of a motorized wheelchair to navigate within Arlington.  Mr. Frame is an individual with a disability under the ADA.

19.     Plaintiff Wendell Decker ("Mr. Decker") resides at 1312 Redbud Drive in Arlington, Texas and travels within Arlington to conduct business and/or other routine daily activities as further described *infra.*  Mr. Decker has diabetic neuropathy and is required by prescription to limit his driving time and walking distance.   Mr. Decker

requires the use of a motorized wheelchair to navigate within Arlington. Mr. Decker is an individual with a disability under the ADA.

20.    Plaintiff Scott Updike ("Mr. Updike") resides at 6700 Paces Trail #911, Arlington, Texas, and travels within Arlington to conduct business and/or other routine daily activities as further described *infra.* Mr. Updike is a quadriplegic and requires the use of a motorized wheelchair to navigate within Arlington. Mr. Updike is an individual with a disability under the ADA.

21.    Plaintiff Juan Nunez ("Juan"), a minor of thirteen years of age, resides with his next friend and mother, Gabriela Castro ("Ms. Castro") at 3301 Steeplechase Trail, Arlington, Texas, and travels within Arlington to conduct business and/or other routine daily activities as further described *infra.* Juan has Duchenne Muscular Dystrophy (DMD) and requires the use of a motorized wheelchair to navigate within Arlington. Juan is a qualified individual with a disability under the ADA.

22.    Plaintiff Mark Hamman ("Mr. Hamman") resides at 2709 Serenade Court, Arlington, Texas, and travels within Arlington to conduct business and/or other routine daily activities as further described *infra.* Mr. Hamman has been a long-time paraplegic who recently had rotator cuff surgery so that he is currently tri-plegic. He requires the use of a motorized wheelchair to navigate within Arlington. Mr. Hamman is a qualified individual with a disability under the ADA.

23.    Plaintiff Joey Salas ("Mr. Salas") resides at 419 Summit Avenue #106 in Arlington, Texas, and travels within Arlington to conduct business and/or other routine daily activities as further described *infra.* Mr. Salas has cerebral palsy and requires the use of a motorized wheelchair to navigate within Arlington. Mr. Salas is a qualified individual with a disability under the ADA.

## FACTS COMMON TO ALL COUNTS

24.    Within the last two years, if not also longer, the Plaintiffs have been unable to travel safely on Arlington's sidewalks and streets without curb ramps or properly installed curb ramps because of the use of motorized wheelchairs.  Within the last two years, if not also longer, the Plaintiffs have been unable to travel safely on Arlington's pedestrian rights-of-way because many sidewalks are not properly maintained, contain abrupt vertical changes in level violation, excessive cross slopes, and/or contain obstructions from protruding objects.  Curbs and poorly maintained sidewalks are major obstacles to persons who use wheelchairs.  The front wheels are sensitive to obstacles, and any non-compliant change in level, crack or slope can impede the progress of a wheelchair, damage a wheelchair, or increase the possibility of overturning a wheelchair and seriously injuring its passenger.

25.    The Plaintiffs have traveled on and will continue to travel on the pedestrian rights-of-way within Arlington which either contain no curb ramps or unsafe curb ramps due to improper design, installation, construction, and/or maintenance and sidewalks which contain abrupt vertical changes in level violations, excessive cross slopes, and/or protruding objects which make travel dangerous if not impossible for the mobility impaired.

26.    The Plaintiffs live in Arlington and frequently travel within Arlington to conduct business and other routine daily activities.  They are frequently denied the full and equal use and enjoyment of Arlington's pedestrian rights-of-way while conducting daily activities.  Their ability to live within their home community is negatively impacted by the inaccessible sidewalks, lack of curb ramps and/or non-compliant curb ramps, which include streets and sidewalks primarily in close proximity to their home and

beyond. As a result, they are forced to engage in difficult and/or risky dangerous travel in order to reach certain destinations. The difficulty lies in the fact that they often must take longer routes to avoid access barriers that non-disabled persons can easily overcome. The danger lies in the fact that they are often forced from sidewalks onto busy streets where they must negotiate through vehicular traffic. Once in the street, they are often inhibited from regaining access to sidewalks due to intersections with no curb ramps and/or non-compliant curb ramps that are either too steep and/or contain excessive vertical changes in level violations at their transition base.

27. Juan travels independently in his motorized wheelchair. Every day, for example, he goes to Young Junior High School on 3200 Woodside Drive in Arlington. On information and belief, Juan encounters violations of the ADA along the public rights of way in Arlington. For example, Juan travels to Martin High School on 4501 W. Pleasant Ridge Road in Arlington – his future full-time school. (Juan is presently active in the school choir and performs there.) He should be able to travel on existing sidewalks to get there and not in the middle of streets with traffic. Woodside Drive has the sidewalk that will take him to W. Pleasant Ridge Road, but it is missing curb ramps, e.g. at the intersection of Woodside Drive and W. Mayfield Road. In addition, approximately twice per week, Juan visits his aunt and her son (who is also in a wheelchair). Juan should be able to travel independently to their house near the intersection of Woodside Drive and W. Arkansas Lane, but since there is no sidewalk on Steeplechase Trail, he is forced to travel in the street. Due to his mobility impairment, he is unable to jump out of the way of oncoming traffic or to walk on the grass. To protect him, Ms. Castro is forced to travel alongside him in a vehicle so he does not get sideswiped or struck by traffic. Juan does go independently to his cousin's school,

however, at least once per year for carnivals and other open-house events. To arrive at Dunn Elementary School, on 2201 Woodside Drive in Arlington, Juan travels north on Woodside Drive, but finds no curb cuts north of West Arkansas Lane to allow him to get up on the existing sidewalk. Juan must travel in the street with vehicular traffic when all others may simply step up onto the sidewalk. Juan has frequented these locations regularly within the past two (2) years, if not longer.

28.    When Mr. Hamman leaves his house, he travels on California Lane, which is characterized by commercial, residential, and municipal areas. Mr. Hamman votes at Short Elementary School on 2000 California Lane, and has difficulty with the excessive slope of the eastern curb ramp at the entrance to the school. Mr. Hamman would love to visit the park that is in proximity to the school, and the nature preserve, together with his son; however, he is denied access due to a lack of curb cuts. Another problem is that the sidewalks along California Lane are not contiguous, e.g. several areas provide a sidewalk that simply stops in the middle of a neighborhood block. Another type of non-contiguous sidewalk is found on the northern side of California Lane across from Short Elementary School: a wheelchair user must travel from the sidewalk to the noncompliant surface of a gravel driveway to get out onto the street, must move approximately 15 feet together with vehicular traffic, and drive up another driveway to reach the sidewalk again.

29.    In the past two years, if not longer, Mr. Hamman has traveled to various destinations in proximity to California Lane to which he has the intent to return, such as the commercial areas of Cooper Street in the east and S. Bowen Road in the west, and he has personally encountered a multitude of ADA violations along the way. Numerous utility poles are located directly in the middle of sidewalks on California Lane; sidewalks

that are no wider than 36 inches.  Due to the obstructions, the sidewalks are effectively off-limits to people in wheelchairs.  Arlington also installs many support cables in the middle of sidewalks with the same result: inaccessibility for the wheelchair user.  Many areas along California Lane have excessive cross slope violations, and many areas have excessive vertical changes in level.  A non-exclusive list of other specific violations follow:

A.    California Lane and Monties Lane.  Southeastern curb cut is too narrow, approximately 24-26 inches.  Southwestern sidewalk has excessive cross slope.

B.    California Lane and Westchester Drive.  No curb cuts are found.

C.    California Lane and Duther Drive.  No curb cuts are found.

D.    California Lane and Fox Hill Drive.  No curb cuts are found.

E.    California Lane and Avon Hill Drive.  No curb cuts are found.

F.    California Lane and Canongate Drive.  No curb cuts are found.

G.    California Lane and Inniswood Circle.  Excessive cross slope is found.

H.    California Lane and Monterey Street.  No curb cuts are found.

I.    California Lane and S. Fielder Road. No curb cuts are found except for the southwestern corner.  The other corners show newly poured concrete, but no curb cuts were provided to make the intersection accessible.

J.    California Lane between S. Fielder Road and Monterey Street. Noncontiguous sidewalks are found.

K.    California Lane just east of S. Fielder Road.  Electrical box is found in the middle of the northern sidewalk.

L.    California Lane and Medin Drive.  No curb cuts are found.

30.    Mr. Salas is a student at the University of Texas at Arlington ("UTA") and is active in the downtown area.  Mr. Salas has frequented the locations described below regularly within the past two (2) years, if not longer.  He uses his motorized wheelchair to cover a wide span of the city within the four corners of Bowen Road to the west, State Road 360 to the east, Interstate 30 to the north, and Interstate 20 to the south.  Regular destinations in Arlington include: Allumed, 2004 E. Randol Mill Road; Rangers Ballpark, 1000 Ballpark Way; Wal-Mart, 915 E. Randol Mill Road; Elron's Cost Plus, 550 W. Randol Mill Road; Kroger's, 301 S. Bowen Road; Guaranty Bank, 100 E. Abram Street; and the Parks Mall, 3811 S. Cooper Street.  Mr. Salas travels to these destinations and many others in his wheelchair since he has no other mode of transportation; he travels on average 8 miles every day.  For example, Mr. Salas travels to Allumed, where he gets his wheelchair serviced, approximately once every 1-2 months, usually by traveling east on UTA Boulevard, then north on West Street, then east on W. Front Street, then north on either Mesquite Street, Elm Street or East Street, then east on W. Rogers Street, then north on N. Collins Street, then east on E. Randol Mill Road and past Ballpark Way to his destination.  (Neither Mesquite, Elm nor East streets have any sidewalks, but he drives on those roads to avoid Collins Street due to its lack of compliant sidewalks and heavy traffic on the road.  Collins Street has, for example, non-contiguous sidewalks, so rather than risk riding a wheelchair in traffic, Mr. Salas has been forced to ride on non-compliant grass surface and uneven ground.)  On numerous trips in Arlington, Mr. Salas has personally encountered ADA violations, and/or has actual notice of the violations and purposely avoids them.  The ADA violations include, but are not limited to:

**de la O ▪ Marko ▪ Magolnick ▪ Leyton**

TELEPHONE  305/285-2000          3001 S.W. 3RD AVENUE, MIAMI, FLORIDA  33129          FACSIMILE  305/285-5555

A.    UTA Boulevard, on both sides of the street, has street signs that obstruct and narrow the width of the sidewalk to less than the required minimum of 36 inches.

B.    E. Copeland Road and Ballpark Way.  E. Copeland Road has sidewalks but no curb cuts.

C.    W. Randol Mill Road and N. Oak Street.  No curb cuts are found on the south side of the intersection.  On the north side, a utility pole is found in the middle of the sidewalk surrounded by newly poured concrete.

D.    Randol Mill Road and N. Center Street.  New concrete has been poured where a curb cut was removed from the southeast intersection.  On the northern side of the intersection, curb cuts exist to cross Randol Mill Road but no curb cuts exist to cross Center Street.

E.    E. Randol Mill Road and Mesquite Street.  Southeast corner is covered in a non-compliant surface of dirt and grass.

F.    E. Randol Mill Road and Thannisch Drive.  Curb cuts are missing and there is a utility pole in middle of sidewalk.

G.    E. Randol Mill Road and Web Street.  No curb cuts are found on the south side of the intersection.

H.    E. Randol Mill Road and Roosevelt Street.  No curb cuts are found on the north side or the south side of the intersection.

I.    E. Randol Mill Road and Collins Street.  This intersection is adjacent to the new Dallas cowboy football stadium.  There is a signal pole and signal control box in middle of the sidewalk on the southwest corner of the intersection.  The signal control box obstructs the curb

ramp's clear landing.  The sidewalk on the east side of Collins Street is narrowed to a width of 9 to 21 inches in places due to construction. Arlington provided no temporary right of way.   Further east on E. Randol Mill Road, Mr. Salas has not been able to reach the pedestrian push buttons from the sidewalk at various intersections.

J.      E. Division Street and Truman Street.   Car dealerships position their barriers over the public sidewalk, obstructing it.  On the north and south sides of the intersection, utility poles also block the sidewalk.  In the northwestern corner, access to the curb ramp is blocked by a pole, a stop sign, a fire hydrant and the car dealership barrier.  In the northeastern corner, the curb ramp has excessive slope. There is construction in various locations along Division Street and no temporary accessible path of travel is provided.  There is also excessive cross slope over many areas of Division Street.

K.      E. Division Street and East Street.   No curb cuts are provided.

L.      E. Division Street and Mesquite Street.   The southeastern corner sidewalk has non-compliant surface with excessive vertical changes in level and excessive slope.

M.      E. Division Street and Elm Street.   The NW and NE corners have no curb cuts and the car dealership barriers obstruct the sidewalk.

N.      E. Division Street and Center Street.   The curb cuts on the north side of the intersection are non-compliant.

O.      Division Street between Center Street and Cooper Street.  Division Street has many obstructions (poles) in the middle of the sidewalk, the

sidewalks have areas of excessive cross slope, and the intersections lack curb cuts or have extremely noncompliant curb cuts, especially on the north side. The non-compliant intersections are: Pecan Street, Oak Street, L. Robinson Drive, West Street, Indiana Street/Jerry Crocker Street, Terry Lewis Street, and Taylor Street. The intersection of Division Street with West Street has a hole on the corner that prevents Mr. Salas from being able to reach the pedestrian push button.

31.    Mr. Salas is often prevented from arriving at his destination by more than architectural barriers. The police have been called regularly, approximately twice per month, to get him off the street. The only reason he has been in the street is because of a lack of accessible sidewalks. While he was on E. Copeland Road near Ballpark Way, he was stopped by four police officers, a fire truck and an ambulance on or about May 12, 2007. One of the police officers thought he was drunk and was going to arrest him until a firefighter intervened and told the officer that Mr. Salas had cerebral palsy. Insulted, Mr. Salas was forced to arrange for transportation to his residence. All of that could have easily been avoided. E. Copeland Road does indeed have a sidewalk- just no curb cuts. Mr. Salas has been hit twice by vehicular traffic, on or about November 12, 2005 and March 19, 2006. On both occasions he received major physical injuries from which he still suffers pain and a decreased ability to live independently.

32.    Several important destinations for Mr. Frame include, but are not limited to, the Medical Center of Arlington, Arlington Memorial Hospital, and the downtown area of the City of Arlington. When Mr. Frame travels to these destinations he is driven by his caretaker in a van. On several occasions within the last two years, Mr. Frame had a test performed at these hospitals and was instructed to come back in approximately two

hours.    Because it is difficult to find van-accessible parking at businesses in the surrounding areas, Mr. Frame has left his van parked in the hospital parking lot and attempted to travel on the surrounding public rights-of-way areas in his motorized wheelchair.  However, regardless of which medical district Mr. Frame has traveled in, he encounters numerous access barriers on the surrounding public rights-of-way areas.

33.    Mr. Frame visited Medical Center of Arlington on several occasions during 2004.  These dates include, but are not limited to, August 13, 2004, August 6, 2004, and January 22, 2004.  During these visits while awaiting test results and additional testing, Mr. Frame attempted to travel to nearby medical supply stores, restaurants such as Café Pulidos, a barbershop for a haircut, Vandergriff Park, and Central Imaging of Arlington.  In order to reach these destinations, Mr. Frame has attempted to travel on the sidewalks adjacent to Omega, Mayfield, and Matlock Road.  However, the sidewalk adjacent to Mayfield between Matlock Road and Hospital Drive has several cracks and major indentations reducing the sidewalk to 25 and 31 inches prohibiting the path of travel for a wheelchair user.  There are also several abrupt vertical changes in level that are at least 1.5 inches and several excessive non-compliant cross slopes ranging between 5.1% and 6.5%.  Continuing further, the curb ramp at Hospital Drive and Mayfield has an excessive non-compliant running slope of 11.3%.  The curb ramp on the northeast corner of Mayfield and Matlock Road has an excessive non-compliant running slope of 17%.

34.    On information and belief, the portion of Mayfield that runs in front of Medical Center of Arlington has been altered or resurfaced after the 1992 effective date of the ADA.  Portions of the sidewalk have also been altered or redone in this area within ten (10) years of Plaintiffs' initial complaint.  A curb ramp was redone or poured in

this area within three (3) years of Plaintiffs' initial complaint, and the curb on the other side was never addressed.

35.    Mr. Frame may also travel to the above-named destinations by riding his wheelchair on the sidewalk adjacent to Matlock Road.  However, when Mr. Frame has attempted to travel on the Matlock Road sidewalk, he has fared no better.  Several non-compliant cross slopes ranging between 6.1% and 9.5% exist near the main handicap entrance where the sidewalk intersects with driveways.  The curb ramp at Omega and Matlock Road next to the Vandergriff Park entrance has an excessive non-compliant running slope of 5.9% and cross slope of 7.7%, along with a utility pole obstruction prohibiting the path of travel for a wheelchair user.  Further along the Matlock Road sidewalk in front of Vandergriff Park, the sidewalk has many areas containing excessive non-compliant cross slopes ranging 4.1% to 5.4%.  Finally, the curb ramp in front of the Texas Department of Human Services has an excessive non-compliant running slope of 21%, and an excessive vertical change in level of 2 inches at its transition base, along with another obstruction prohibiting the path of travel for a wheelchair user.  On information and belief, several other sidewalks and curb ramps within close proximity to the above described areas also have similar access violations.

36.    On information and belief, the portion of Matlock that runs adjacent to Medical Center of Arlington has been altered or resurfaced after the 1992 effective date of the ADA.  Portions of the sidewalk in this area have also been altered or redone in this area within five (5) to ten (10) years of Plaintiffs' initial complaint.

37.    The Arlington Memorial Hospital district has been another important destination for Mr. Frame.  On information and belief, in the Arlington Memorial Hospital area described below (¶¶ 30 - 32), Randol Mill Road has been altered, or resurfaced

within ten (10) years prior to Plaintiffs' initial complaint.  On information and belief, the sidewalks on both sides of Randol Mill Road in this area have large portions that have been reconstructed, altered, or resurfaced within five (5) to ten (10) years prior to Plaintiffs' initial complaint, depending on the location.

38.     On or about September 29, 2003, after having minor outpatient surgery at Arlington Memorial Hospital, Mr. Frame attempted to navigate the surrounding public rights-of-way areas located on Randol Mill Road.  When attempting to reach another Central Imaging of Texas location on Randol Mill Road, Mr. Frame encountered many of the same types of access violations as described *supra*.

39.     The public sidewalks on both sides of Randol Mill Road have many intersections with either non-compliant curb ramps or no curb ramps at all.  The sidewalks also contain numerous obstructions prohibiting the path of travel for wheelchair users, including tree stumps and brand new utility poles.  On information and belief, several other sidewalks and curb ramps within close proximity to the above described areas also have similar access violations.

40.     On or about December 18, 2004, when again attempting to reach the Central Imaging of Texas location on Randol Mill Road, Mr. Frame encountered many of the same barriers to access as previously described.

41.     The Arlington Memorial Hospital district around Randol Mill Road is also an important destination for Mr. Decker.  Mr. Decker often travels to the 7-11 store located on Randol Mill Road and must also travel to Arlington Memorial Hospital three times a week for cardiac rehabilitation exercises.  Quite often, there are no available handicap parking spaces in the hospital parking lot.  In addition, driving is something that has become increasingly difficult and will continue to worsen for Mr. Decker over

time.   As an option, because Mr. Decker lives within one (1) mile of the hospital, he would like to have the full benefit and use and enjoyment of Arlington's public rights-of-way to access Randol Mill Road in order to reach Arlington Memorial Hospital. However, due to the access violations described *supra*, Decker is prohibited from traversing the sidewalk on either side and must engage in risky street travel to reach his destination.   In addition to the access violations on Randol Mill Road, the southwest corner of Redbud and Davis near Mr. Decker's home has no curb ramp, forcing Mr. Decker into the street when he begins his travel.

42.    In or about September 2004, Mr. Decker attempted to access the shopping center located at Cooper and Randol Mill Road.   When Mr. Decker attempted to navigate the surrounding public rights-of-way areas on Redbud, Davis, and Randol Mill Roads, he was forced to engage in difficult and/or risky dangerous travel in order to reach his destination, resulting from having to take longer routes or being forced into the streets to avoid access barriers that non-disabled persons could easily overcome.

43.    On information and belief, the sidewalks on Randol Mill Road near Davis are pre ADA construction but several curbs have been redone within five (5) years of Plaintiffs' initial complaint.   Randol Mill Road has been altered or repaved within the last ten (10) to twelve (12) years over several City blocks in this area.   Sections of the sidewalk on the north side of Randol Mill Road just east of Cooper show fresh sidewalk pour with no curb cuts being provided.   Again, Randol Mill Road has been altered or repaved within the last ten (10) to twelve (12) years over several City blocks in this area. On information and belief, the sidewalks servicing Redbud and Davis are pre ADA construction and Redbud and Davis appear to have not been altered since the ADA.

44.    Another important destination for Mr. Frame is the downtown Arlington area where he would like to have the full benefit and use and enjoyment of Arlington's public rights-of-way to access streets such as Border Street, South Street, and Abram Street in order to conduct personal and/or business activities including accessing the U.S. Post Office, the Municipal and Sub Courthouses, his attorney's office, and restaurants including J. Gilligan's.  Within the last two years, if not also earlier, Mr. Frame has frequently visited these locations.  These dates include, but are not limited to, July 1, 2005, March 14, 2005, February 8, 2005, and October 30, 2003.

45.    On information and belief, Border Street has been altered or resurfaced over several city blocks in the downtown area described below (¶ 39 A – P) within five (5) years prior to Plaintiffs' initial complaint, depending on the location.  On information and belief, there are portions of the sidewalks on both sides of Border Street in these areas that have been reconstructed, altered, or resurfaced within ten (10) years prior to Plaintiffs' initial complaint.

46.    On information and belief, Abram Street has been altered or resurfaced over several city blocks in the downtown area described below (¶ 39 A – P) within five (5) to ten (10) years prior to Plaintiffs' initial complaint, depending on the location.  On information and belief, there are portions of the sidewalks on both sides of Abram Street in these areas that have been reconstructed, altered, or resurfaced within ten (10) years prior to Plaintiffs' initial complaint.

47.    On information and belief, South Street has been altered or resurfaced over several city blocks in the downtown area described below (¶ 39 A – P) within five (5) to ten (10) years prior to Plaintiffs' initial complaint, depending on the location.  On information and belief, there are portions of the sidewalks on both sides of Abram Street

in these areas that have been reconstructed, altered, or resurfaced within ten (10) years prior to Plaintiffs' initial complaint.

48.    Mr. Frame has attempted to travel on Border Street ("Border"), South Street ("South"), and Abram Street ("Abram").  However, in each of these locations he is confronted with numerous access barriers as discussed *supra*.  Those locations and access barriers include, but are not limited to, the following:

A.    The sidewalk on Abram directly in front of City Hall has a non-compliant cross slope of 3.7%.  The sidewalks on the south side of Abram between West and College, East and Elm, and Lampe and Cooper are non-contiguous.

B.    The northwest corner of Abram and Mesquite has a non-compliant curb ramp with an abrupt vertical change in level at its transition base in one direction and no curb ramp in the other direction.

C.    The southwest corner of Abram and Center has a non-compliant curb ramp with an excessive running slope and the sidewalk just beyond the curb ramp has a non-compliant cross slope.  On information and belief, Center has also been altered or resurfaced between Abram and South within five (5) to ten (10) years prior to Plaintiffs' initial complaint.

D.    The northwest corner of Abram and Oak has a non-compliant curb ramp with an excessive running slope and the sidewalk just beyond the curb ramp has an excessive cross slope.

E.    The southwest and southeast corners of Abram and West have non-compliant curb ramps and non-contiguous sidewalks.

F.      The southeast corner of Abram and Elm has a non-compliant curb ramp with an excessive running slope and a non-contiguous sidewalk just beyond the curb ramp.

G.      The southwest corner of Abram and East has a non-contiguous sidewalk and no curb ramp at all.

H.      The sidewalks near the northeast and southeast corners of South and West have extended and excessive cross slopes ranging between 5.6% and 7%.

I.      The northwest corner of South and Mesquite has a utility pole obstruction prohibiting the path of travel for wheelchair users, while the northeast corner has a non-contiguous sidewalk in one direction beyond the curb ramp.  The sidewalk beyond the northwest corner is also non-compliant.

J.      The sidewalks on the south side of South and Mary and the south side of South and Elm in front of the post office are non-contiguous, while the north side of South and Mary has no curb ramps at all.  On information and belief, Mary has been altered or resurfaced within the last five (5) to ten (10) years prior to Plaintiffs' initial complaint between from Abram to Border.

K.      The sidewalk on the south side of Border in front of the Sub Courthouse and beyond is non-contiguous and contains non-compliant curb ramps projecting wheelchair users into vehicular lanes.  The sidewalk on the north side of Border directly across from the Sub Courthouse is also non-contiguous.

L.      The southeast corner of Border and Mary has no curb ramp, while the northwest corner of Border and Mary has a non-contiguous sidewalk beyond the curb ramp.  Again, on information and belief, Mary has been altered or resurfaced within the last five (5) to ten (10) years prior to Plaintiffs' initial complaint between from Abram to Border.

M.      The sidewalk on the south side of Border near Mesquite and between Mary and East and is non-contiguous and also contains no curb ramps in an area of the sidewalk between Mesquite and Elm.

N.      The northeast corner of Border and Elm by the rear of the post office has no curb ramp at all.  Just beyond the northeast corner where a curb ramp should exist, the sidewalk also has an abrupt vertical change in level of at least 2 inches and an excessive non-compliant cross slope of 6.1%.

O.      Mr. Frame has also become aware of other access barriers while attempting to access South Pecan Street near Mission Arlington.  On information and belief, this area also contains numerous access barriers as described *supra*.

P.      The Sub Courthouse located on Border contains two (2) handicap accessible parking spaces with excessive running slopes or cross slopes.

49.      Another destination for Mr. Frame includes the area around Matlock and Cravens.  Mr. Frame would like to have the full benefit and use and enjoyment of Arlington's public rights-of-way in this area to access his credit union, pharmacy, veterinarian's office, and park where he would like to walk his dogs after their visits to the veterinarian's office.  Within the last two years, if not also earlier, Mr. Frame has

frequently visited these locations.  These dates include, but are not limited to, July 14, 2005, June 28, 2005, April 7, 2005, November 12, 2004, and April 7, 2004.  However, because of the poor condition of the sidewalks in this area, Mr. Frame is unable to do so safely.  He must either take a more difficult and longer route, or risk traveling in the street.  On information and belief, the sidewalks and streets in this area appear to be pre ADA construction and have not been altered since the ADA.

50.     Other destinations for Mr. Frame include the Bob Duncan Community Center and the Cliff Nelson Recreation Center where he has voted within the last two years, including the most recent presidential election, when he attempted to vote early in October 2004.  The handicap accessible route at the front of the Cliff Nelson Recreation Center has an excessive running slope.  The facility also has an insufficient number of handicap accessible parking spaces and lacks a van space.  On information and belief, the parking lot and accessible route at the Cliff Nelson Recreation Center was constructed within the last five (5) to ten (10) years.  The Bob Duncan Community Center lacks a van accessible handicap parking space.

51.     Mr. Updike is a veteran of the U.S. Army, and he was discharged in 1985, after two years of service to our country.  He became a quadriplegic on September 8, 2003, after a tragic automobile accident.  Now the only motorized vehicle he drives is his wheelchair.  Although Mr. Updike triumphed over the challenges of military service, he finds it extremely difficult to overcome the barriers to accessibility that Arlington has not rectified.  For example, Mr. Updike has two school-age daughters, and in order to remain a responsible, loving father, he attends school events and supports his daughters' education.  One daughter goes to Bailey Junior High on 2411 Winewood Avenue, and the other daughter attends Ruby Ray Swift Elementary on 1101 S. Fielder

Road.   For example, on Tuesday, September 27, 2005, he had to travel in his wheelchair on Bowen Road in order to accompany his daughter to a school event. Since Arlington does not provide proper access to the school for Mr. Updike by providing ADA-compliant sidewalks and curb ramps, he is forced to travel in the street with vehicular traffic and also forced to take longer routes.

52.     Mr. Updike has lived in Arlington for the past two years, and regularly travels to Albertsons on Little Road to buy groceries, about six to ten times per month. He also shops at Big Lots on Green Oaks Boulevard about two times per month.  He goes roughly every other day to CVS Pharmacy at Little Road and Green Oaks Boulevard.  Further, Mr. Updike goes twice per month to Wells Fargo on Little Road. These are examples of destinations that are important for Mr. Updike to access regularly, but this is certainly not an exclusive list of all destinations that Mr. Updike has attempted to access in the past two years.

53.     On information and belief, Arkansas Lane has been altered or resurfaced in the areas below within five (5) to ten (10) years prior to Plaintiffs' initial complaint, depending on the location.  On information and belief, portions of the sidewalks in the areas below (subparagraphs A – F) have been reconstructed, altered, or resurfaced within ten (10) years prior to Plaintiffs' initial complaint.  Mr. Updike has attempted to travel along Arkansas Lane ("Arkansas"), which he uses as a transit route to destinations on other streets.  However, he is confronted with numerous access barriers on Arkansas as discussed *supra*.  The access barriers include, but are not limited to, the following:

A.     On the south side of Arkansas between Roosevelt Drive and Bowen, the storm drain is elevated and has an abrupt 2.5 inch vertical

change in level.  The storm drain elevation is important to note since it encroaches upon the sidewalk, as does a telephone pole at the same location.  The resulting width of sidewalk between the storm drain and the telephone pole is about 18 inches, prohibiting the path of travel for a wheelchair user.  A little further east on Arkansas, the same sidewalk abruptly ends at the construction site, with no temporary provisions being made for the mobility impaired to enter or exit from the sidewalk to the road.  The same sidewalk also has another storm drain behind which the sidewalk has been removed, requiring a wheelchair to traverse on risky uneven ground.

B.    On the north side of Arkansas, about halfway between Bowen and Westchester Drive, a sidewalk that might otherwise be compliant is badly maintained so that greenery encroaches on the sidewalk making it impassable in a wheelchair.  In the same overgrown area, a telephone pole encroaches on the sidewalk prohibiting the path of travel to a wheelchair user.  Next to that, a driveway that intersects with the sidewalk has a non-compliant cross slope.  Further east and closer to Westchester Drive, the sidewalk is non-contiguous at the telephone pole, and a wheelchair user must travel on risky uneven ground.

C.    On the north side of Arkansas, further east and closer to Windy Pine Lane, there is a telephone poll in the center of the sidewalk that prohibits the path of travel for a wheelchair user.  The sidewalk has an excessive non-compliant cross slope of 12.8%, where it intersects with a driveway.  A little further east, a storm drain nearly eclipses the entire

sidewalk, and contains an abrupt 2 inch vertical change in level. Further east and closer to Engleford Drive, the sidewalk was repaved on both sides of the storm drain, but the new pavement stops short about a yard away from the curb, which also has no curb ramp.

D.      On the south side of Arkansas near Engleford Drive, the telephone pole is positioned on the sidewalk, blocking the exit or entrance to the portion of the sidewalk that crosses a driveway, which also has an excessive cross slope. The portion of the sidewalk that is not blocked by the telephone pole does not have a curb ramp. Further east on the south side, there are no curb ramps and the sidewalk that intersects with a driveway has an excessive non-compliant cross slope.

E.      On the south side of Arkansas near Avonhill Drive, a wheelchair user needs to overcome a 1 inch vertical change in level to enter the sidewalk from the driveway. As a further hindrance, both the running slope and the cross slope of the curb are extremely excessive and non-compliant. Further to the east, a wheelchair user may choose to either drive over a narrow area of grass with uneven ground and a dangerous slope that is encroached by a telephone pole, or risk falling down from the same curb where there is no curb ramp. Further to the east, closer to Laredo Court, there is an extremely narrow curb ramp with excessive non-compliant cross and running slopes.

F.      On the north side of Arkansas, about 25 yards west of Fielder, the sidewalk that intersects with a parking lot driveway has a non-compliant cross slope of 8%. A little further east, the sidewalk intersects with

another parking lot driveway producing a non-compliant cross slope of 11%. A third area of the sidewalk that intersects with another parking lot driveway also has a non-compliant cross slope.

54.    On information and belief, Green Oaks Boulevard has been altered or resurfaced in the areas below within five (5) to ten (10) years prior to Plaintiffs' initial complaint, depending on the location.   On information and belief, portions of the sidewalks in the areas below (subparagraphs A – E) have been reconstructed, altered, or resurfaced within ten (10) years prior to Plaintiffs' initial complaint.  Mr. Updike has also attempted to travel to and on Green Oaks Boulevard ("Green Oaks").  However, he is confronted with numerous access barriers on Green Oaks as discussed *supra*.  The access barriers include, but are not limited to, the following:

A.    The southwest intersection of Green Oaks and Ronny Snow Drive the curb ramp has a non-compliant cross slope of 13.6%, and non-compliant running slope of 13.1%.

B.    Further north, on the east side of Green Oaks and south side of Quail Lane, the curb has an excessive non-compliant slope of 9.9%, and an excessive non-compliant slope of 16%.

C.    Further north on the east side, the sidewalk has an excessive non-compliant slope is 12.1%.  Close to Chaperito Trail, the east side has a curb with an excessive non-compliant running slope of 22.1% and a non-compliant vertical change in level its transition base.

D.    Also near Chaperito Trail, the sidewalk is non-contiguous and broken in front of the telephone pole, and the ground that must be traversed is uneven with loose dirt and grass.

E.      Further north near Holly Hollows Drive, the sidewalk is also broken in front of a telephone pole with a ditch resulting on the side closest to the pole, making it impassable by a wheelchair user.

55.      On information and belief, Little Road has been altered or resurfaced in the areas below within five (5) to ten (10) years prior to Plaintiffs' initial complaint, depending on the location.  On information and belief, many of the sidewalks, where they are provided, have been reconstructed, altered, or resurfaced within five (5) to ten (10) years prior to Plaintiffs' initial complaint, depending on the location.  Mr. Updike has attempted to travel to and on Little Road, but he is confronted with numerous access barriers, as discussed *supra*.  The access barriers include, but are not limited to, the following:

A.      On the east side from Treepoint Drive to US-287, the curb ramp has a non-compliant running slope of 10.5%.  On both the east and west sides, there are numerous segments with no sidewalks or accessible routes provided, not even to access pedestrian cross signal buttons.  Where a sidewalk is provided, it is believed to have been constructed, reconstructed, or altered within five (5) years prior to Plaintiffs' initial complaint.

B.      On the west side from US-287 to Arborgate Drive, the curb ramp has an excessive non-compliant running slope of 10.9%, and the accessible route has an excessive cross slope of 6.3% with an abrupt 1 inch vertical change in level.  The south curb ramp has an excessive non-compliant running slope of 14.1%.  There is a non compliant cross slope of 6.2% where the sidewalk intersects with a driveway.  The north curb

ramp has an excessive non-compliant running slope of 14.8%. The southwest curb ramp has an excessive non-compliant running slope of 10.4%. The northwest curb ramp has an excessive non-compliant running slope of 18.4%. The sidewalk on the west side in this area is believed to have been constructed, reconstructed, or altered within ten (10) years prior to Plaintiffs' initial complaint. On the east side, no sidewalk or accessible route is provided.

C.     On the east side from Arborgate Drive to Dangerfield Court, the sidewalk does not have a curb ramp where the accessible route crosses the curb. The sidewalk also contains several abrupt vertical changes in level, several non-compliant cross slopes of 4.5% or higher which extend 20 feet in some areas. Several accessible routes have non-compliant cross slopes of 7%, 7.4%, 4.1%, 4.3%, and 8.8%. No sidewalk or accessible route is provided to the pedestrian cross signal button. The sidewalk has non-compliant cross slopes of 12.6% and 10.8% where it intersects with two driveways. The sidewalk on the east side in this area is believed to have been constructed, reconstructed, or altered within five (5) years prior to Plaintiffs' initial complaint.

D.     On the west side from Arborgate Drive to Dangerfield Court, the sidewalk has non-compliant cross slopes of 4.4% and 8.3%, and abrupt 3-inch vertical change in level. There is also no curb ramp where the accessible route meets the curb. The sidewalk on the west side in this area is believed to have been constructed, reconstructed, or altered within five (5) years prior to Plaintiffs' initial complaint.

E.     On the west side from Dangerfield Court to I-20 Highway, the sidewalk has a 1 inch vertical change in level.  The south curb ramp has an excessive non-compliant running slope of 15.1%.  The sidewalk has non-compliant cross slopes of 4.2% and 8%.  The north curb ramp has an excessive non-compliant running slope of 11.2%.  The foot of the curb ramp also has an abrupt 1 inch vertical change in level.  The sidewalk on the west side in this area is believed to have been constructed, reconstructed, or altered within five (5) years prior to Plaintiffs' initial complaint.  On the east side, no sidewalk or accessible route is provided.

F.     On the west side from I-20 to Poly Webb Road, the sidewalk has a non-compliant cross slope of 5.3% where it intersects with a driveway, and has an abrupt 1.5 inch vertical change in level.  The sidewalk also has a non-compliant cross slope of 4.6% at another location.  The southwest curb ramp has a non-compliant running slope of 9.7% and a non-compliant cross slope of 4.7%.  The sidewalk on the west side in this area is believed to have been constructed, reconstructed, or altered within five (5) years prior to Plaintiffs' initial complaint.  On the east side, no sidewalk or accessible route is provided.

G.     On the west side from Poly Webb Road to Office Park Drive, the curb ramp has an excessive non-compliant running slope of 11.3%.  The sidewalk also has various non-compliant cross slopes of 4.6%, 4%, 4.4%, 5.1%, and 5.6% where it intersects with a driveway.  Another curb ramp has an abrupt 1 inch vertical change in level at its transition base.  Another curb ramp has a non-compliant running slope of 9.1% and cross slope of

9.8%.  The sidewalk on the west side in this area is believed to have been constructed, reconstructed, or altered within five (5) years prior to Plaintiffs' initial complaint.  On the east side, no sidewalk or accessible route is provided.

H.    On the east side from Poly Webb Road to W. Green Oaks Boulevard, the sidewalk does not have a curb ramp where an accessible route meets the curb.  The curb ramps have non-compliant cross slopes of 7.1%, 8.3%, and 4.1%, and non-compliant running slopes of 9.2% and 9.8%.  The surface of the sidewalk is unstable and has loose material in multiple places.  The sidewalk or accessible route has many non-compliant cross slopes of 7.5%, 6.6%, 9.9%, 6.7%, 11.7%, 4.3%, and 4.6% at different locations.  The sidewalk on the east side in this area is believed to have been constructed, reconstructed, or altered within five (5) to ten (10) years prior to Plaintiffs' initial complaint, depending on the location.

I.    On the east side from W. Green Oaks Boulevard to W. Pleasant Ridge Road, the curb ramps have non-compliant running slopes of 9.8%, 13.1%, 9.4%, 10.4%, and 15.4% and cross slopes of 8.1%, 7.3%, 7%, and 8.7%.  The surface of the sidewalk is unstable with loose material and has an abrupt 3.5 inch vertical change in level.  There is no sidewalk or accessible route provided to the pedestrian push button prohibiting access by a wheelchair user.  The sidewalk on the east side in this area is believed to have been constructed, reconstructed, or altered within five (5) to ten (10) years prior to Plaintiffs' initial complaint, depending on the

location, and there is a brand new concrete pour at one curb where no curb cut was provided.

J.     On the west side from Office Park Drive to W. Green Oaks Boulevard, the curb ramp has a non-compliant cross slope of 9.9%.  The accessible route has non-compliant cross slopes of 7.7%, 9.9%, 5.6% and an excessive 11.2% where it intersects with a driveway.  Curb ramps have non-compliant cross slopes of 8.4%, 9.9%, 8.9%, 8.1%, and 7.3%, plus running slopes of 16.5% and 14%.  The island clear floor space has a 7.4% surface slope.  The sidewalk on the west side in this area is believed to have been constructed, reconstructed, or altered within ten (10) years prior to Plaintiffs' initial complaint.

K.     On the west side from W. Pleasant Ridge Road to W. Green Oaks Boulevard, curb ramps have non-compliant running slopes of 13.5% and 9.8%.  One of these curb ramps has a 21.5% slope on the flare side.  These curb ramps also have non-compliant cross slopes of 7.6%, 18.4%, 11.9%, and 9.7%.   The sidewalk has an excessive 20.8% cross slope where it intersects with a driveway.  The sidewalk also has abrupt vertical changes in level of 1.25 inch and 1-inch.  In other locations, the accessible route has excessive non-compliant cross slopes of 11.7%, 6.3%, 5.2%, 12.7%, 10.2%, 8.3%, and 4.8%.  The sidewalk on the west side in this area is believed to have been constructed, reconstructed, or altered within ten (10) years prior to Plaintiffs' initial complaint.

L.     On the east side from W. Green Oaks Boulevard to Tate Springs Road, curb ramps have non-compliant running slopes of 9%, 10%, and

9.8%, and a cross slope of 4.2%. The foot of one curb ramp has an excessive non-compliant running slope of 34.3%. The sidewalk has a 1-inch vertical change in level. The sidewalk does not have a curb ramp where an accessible route meets the curb. The accessible route has other non-compliant cross slopes of 8.2%, 9.2% and an excessive 15.8% where it intersects with a driveway. The sidewalk on the east side in this area is believed to have been constructed, reconstructed, or altered within ten (10) years prior to Plaintiffs' initial complaint.

M.    On the east side from Tate Springs Road to W. Pleasant Ridge Road, the feet of curb ramps have 9.6%, 36.9%, 28.7%, and 36.6% running slopes. The foot of one curb ramp has an abrupt 2.5 inch vertical change in level, and another has a 2-inch vertical change in level. The accessible route has cross slopes of 5%, 5.8%, and 6.3%. The surface of the sidewalk is unstable with loose material. The sidewalk on the east side in this area is believed to have been constructed, reconstructed, or altered within ten (10) years prior to Plaintiffs' initial complaint.

56.    On information and belief, Bowen Road has been altered or resurfaced in the areas below within five (5) to ten (10) years prior to Plaintiffs' initial complaint, depending on the location. On information and belief, the sidewalks have been reconstructed, altered, or resurfaced within five (5) to ten (10) years prior to Plaintiffs' initial complaint. Mr. Updike has attempted to travel to and on W. Bowen Road, but he is confronted with numerous access barriers, as discussed *supra*. The access barriers include, but are not limited to, the following:

A.      On the east side from W. Sublett Road to Collard Road, curb ramps have non-compliant running slopes of 9.5%, 9.6%, and 9.3%, and cross slopes of 9.7%, 5.8%, 4.3%, 6.6% and an excessive 9.4% where it intersects with a driveway.  The sidewalk on the east side in this area is believed to have been constructed, reconstructed, or altered within five (5) to ten (10) years prior to Plaintiffs' initial complaint.

B.      On the east side from Collard Road to SW Green Oaks Boulevard, curb ramps have non-compliant running slopes of 8.6%, 9.3%, and 8.9%, and cross slopes of 7.9% and 7.2%.  The foot of one curb ramp has a non-compliant running slope of 9.2%.  The sidewalk on the east side in this area is believed to have been constructed, reconstructed, or altered within five (5) years prior to Plaintiffs' initial complaint.

C.      On the west side from Collard Road to SW Green Oaks Boulevard, the curb ramp has a non-compliant running slope of 10.5%.  The sidewalk on the west side in this area is believed to have been constructed, reconstructed, or altered within five (5) years prior to Plaintiffs' initial complaint.

D.      On the west side from SW Green Oaks Boulevard to Mandy Way, curb ramps have non-compliant running slopes of 9.4%, 10.1%, and 8.5%, and cross slopes of 6.8%, 9%, 5.3%, 4.7%, and 5.4%.  The sidewalk has an abrupt 1-inch vertical change in level.  A ramp with a slope of 6.3% runs 50 feet in length and does not have the required handrails.  Another ramp has an excessive non-compliant running slope of 16.3%.  The sidewalk or accessible route has numerous non-compliant cross slopes of

9%, 5.5%, 4.5%, and 7.6% where it intersects with driveways. The sidewalk on the west side in this area is believed to have been constructed, reconstructed, or altered within five (5) years prior to Plaintiffs' initial complaint.

E.      From Chad Drive, the west side's curb ramps have non-compliant cross slopes of 10.1% and 5.6%. The east side's curb ramps have non-compliant cross slopes of 8.7% and 13.7%. The sidewalk on the east and west side in this area are believed to have been constructed, reconstructed, or altered within five (5) to ten (10) years prior to Plaintiffs' initial complaint.

F.      On the east side from SW Green Oaks Boulevard to Courtland Drive, the sidewalk has an abrupt 1 inch vertical change in level. The accessible route has non-compliant cross slopes of 5%, 4.5% and an excessive 12.8% where it intersects with a driveway. The curb ramps have non-compliant cross slopes of 10% and 7.8%, and a running slope of 8.6%. The sidewalk on the east side in this area is believed to have been constructed, reconstructed, or altered within five (5) to ten (10) years prior to Plaintiffs' initial complaint.

G.      On the east side from Courtland Drive to Wimbledon Drive, the curb ramp has a non-compliant running slope of 10.3% and a non-compliant cross slope of 10.2%. The sidewalk on the east side in this area is believed to have been constructed, reconstructed, or altered within five (5) to ten (10) years prior to Plaintiffs' initial complaint.

H.      On the east side from Wimbledon Drive, the curb ramp has a non-compliant cross slope of 7.1%.  The sidewalk on the east side in this area is believed to have been constructed, reconstructed, or altered within five (5) to ten (10) years prior to Plaintiffs' initial complaint.

I.      On the east side from Villa Vera Drive, the curb ramps have non-compliant cross slopes of 6.1% and 4.1%, and a non-compliant running slope of 11.7%.  The sidewalk on the east side in this area is believed to have been constructed, reconstructed, or altered within five (5) to ten (10) years prior to Plaintiffs' initial complaint.

J.      On the east side from El Salvador Court, the curb ramps have non-compliant running slopes of 10% and 10.7%, and two abrupt 1-inch vertical changes in level at their transition base.  The sidewalk on the east side in this area is believed to have been constructed, reconstructed, or altered within five (5) to ten (10) years prior to Plaintiffs' initial complaint.

K.      On the east side from W. Barding Road, the curb ramps have non-compliant running slopes of 8.5% and 10.8%, and the foot of one curb ramp has an excessive non-compliant 22.8% running slope.  The sidewalk on the east side in this area is believed to have been constructed, reconstructed, or altered within five (5) to ten (10) years prior to Plaintiffs' initial complaint.

L.      On the east side from Oak Shadow Court, the curb ramps have non-compliant running slopes of 9.2% and 9.1%, and non-compliant cross slopes of 4.8%, 5.2%, and 6.3%.  The sidewalk on the east side in this

area is believed to have been constructed, reconstructed, or altered within five (5) to ten (10) years prior to Plaintiffs' initial complaint.

M.    On the west side from I-20 to Patridge Avenue, the segment is under construction.  Nonetheless, no temporary provisions are made to provide another accessible route.  The accessible route has excessive non-compliant cross slopes of 6.1% and 6.8%.  A curb ramp has a non-compliant cross slope of 5.5%, and its foot has a non-compliant running slope of 9.4%.  The sidewalk on the west side in this area is believed to have been constructed, reconstructed, or altered within five (5) to ten (10) years prior to Plaintiffs' initial complaint.

N.    On the west side from Blue Quail Drive to Chad Drive, the curb ramps have non-compliant cross slopes of 6%, 4.7%, 8.4%, 8.9% and 7.3%, and non-compliant running slopes of 10.3% and 11.5%.  The sidewalk on the west side in this area is believed to have been constructed, reconstructed, or altered within five (5) to ten (10) years prior to Plaintiffs' initial complaint.

O.    On the east side from I-20 to W. Pleasant Ridge Road, the curb ramp has a non-compliant running slope of 10.3% and a non-compliant running slope of 8.6%.  The sidewalk or accessible route has an excessive non-compliant cross slope of 8.2% where it intersects with a driveway. The sidewalk on the east side in this area is believed to have been constructed, reconstructed, or altered within five (5) to ten (10) years prior to Plaintiffs' initial complaint, with curbs that appear to have been poured within five (5) years prior to Plaintiffs' initial complaint.

P.    On the west side from I-20 to W. Pleasant Ridge Road, the curb ramps have non-compliant running slopes of 9.3%, 10.7%, and 13.3%, and a non-compliant cross slope of 4.6%.  The sidewalk on the west side in this area is believed to have been constructed, reconstructed, or altered within five (5) to ten (10) years prior to Plaintiffs' initial complaint, with curbs that appear to have been poured within five (5) years prior to Plaintiffs' initial complaint.

Q.    On the east side from W. Pleasant Ridge Road to Pleasant Circle S, one curb ramp has a non-compliant running slope of 9.4%.  Several curb ramps also have non-compliant cross slopes of 6.7%, 6.5%, and 7.6%.  The foot of one curb ramp has a non-compliant running slope of 10.9%, and 7.3% where it intersects with a driveway.  The sidewalk also has an abrupt 2-inch vertical change in level.  The sidewalk on the west side in this area is believed to have been constructed, reconstructed, or altered within five (5) to ten (10) years prior to Plaintiffs' initial complaint.

R.    On the east side from Pleasant Circle S and Pleasant Circle N, two curb ramps each have non-compliant cross slopes of 10.3%.  Two other curb ramps have non-compliant cross slopes of 10.7% and 6.8%.  The sidewalk on the east side in this area is believed to have been constructed, reconstructed, or altered within five (5) to ten (10) years prior to Plaintiffs' initial complaint.

S.    On the east side from W. Arbrook Boulevard, the curb ramp has an excessive non-compliant cross slope of 12.1%.  The foot of the curb ramp has an excessive non-compliant running slope of 19.9%.  Further, the

pedestrian cross signal button is mounted at 46 inches, with no clear floor space for a wheel chair user to maneuver on. The sidewalk on the east side in this area is believed to have been constructed, reconstructed, or altered within five (5) to ten (10) years prior to Plaintiffs' initial complaint.

T.    On the east of Garden Lane, the curb ramp has a non-compliant cross slope of 8.8%. Further, the pedestrian cross signal button is mounted at 44 inches, with no clear floor space for a wheelchair user to maneuver on. The sidewalk to W. Mayfield Road has an abrupt 2.25 inch vertical change in level, and a curb ramp has a 1.5-inch vertical change in level at its transition base. The sidewalk or accessible route has an excessive non-compliant cross slope of 12.7%. The feet of two other curb ramps have excessive non-compliant running slopes of 10% and a 54.8%. The sidewalk on the east side in this area is believed to have been constructed, reconstructed, or altered within five (5) to ten (10) years prior to Plaintiffs' initial complaint, and the curbs in this area appear to have been poured or redone within five (5) years of Plaintiffs' initial complaint.

U.    On the east side from Sunset Lane to California Lane, the curb ramp has a non-compliant cross slope of 11%, and its foot has an excessive and non-compliant running slope of 54.8%. Another curb ramp has a non-compliant cross slope of 7.2%, and its foot has an excessive non-compliant running slope of 37%. The sidewalk has a non-compliant cross slope of 7.4% where it intersects a driveway. The sidewalk and curbs on the east side in this area are believed to have been constructed,

reconstructed, or altered within ten (10) years prior to Plaintiffs' initial complaint.

V.      On the east side from California Lane, curb ramps have non-compliant running slopes of 11.8% and 14.3%. Pedestrian cross signal buttons are mounted at 51 and 48 inches. The sidewalk and curbs on the east side in this area are believed to have been constructed, reconstructed, or altered within five (5) years prior to Plaintiffs' initial complaint.

W.      On the east side from Catalina Drive, curb ramps have non-compliant cross slopes of 9.5% and 12.1%. The sidewalk and curbs on the east side in this area are believed to have been constructed, reconstructed, or altered within five (5) years prior to Plaintiffs' initial complaint.

X.      On the east side from Palo Alto Drive, curb ramps have non-compliant cross slopes of 12% and 5.7%. The sidewalk and curbs on the east side in this area are believed to have been constructed, reconstructed, or altered within five (5) years prior to Plaintiffs' initial complaint.

Y.      On the east side from W. Arkansas Lane, many curb ramps have non-compliant running slopes of 13.1%, 9.3%, 9.2%, 11.1%, 11.2%, 12.9%, 13.9%, and 16.3%, and non-compliant cross slopes of 7.6%, 10.1%, 5.8%, 5.9%, and 7.9%. In addition, a pedestrian cross signal push button does not have the required clear floor space for a wheelchair user to maneuver on. The sidewalk and curbs on the east side in this area are

believed to have been constructed, reconstructed, or altered within five (5) to ten (10) years prior to Plaintiffs' initial complaint.

Z.      On the west side from W. Arkansas Lane, many curb ramps have non-compliant running slopes of 10.7%, 9.5%, 11.6%, 9.5%, 15.6%, 10.0%, and 8.5%.  In addition, the curb ramp with the 8.5% running slope also has a non-compliant 18.5% running slope at the foot of its transition base.  Many of these curb ramps also have unstable and loose material. The sidewalk and curbs on the west side in this area are believed to have been constructed, reconstructed, or altered within five (5) to ten (10) years prior to Plaintiffs' initial complaint.

57.    On information and belief, Arlington has several other roads not mentioned above which Mr. Updike has attempted to access that have non-compliant sidewalks and curb ramps as described *infra*.  Those roads include Cooper Street, Collins Street, Fielder Road, New York Avenue, Park Row, and Pioneer Parkway. However, Plaintiffs' expert has not had the opportunity to inspect these areas.

58.    On information and belief, Arlington has routinely failed to install curb ramps when resurfacing, repairing, altering, or constructing city streets, roads, and sidewalks or construct such curb ramps properly since the effective date of the ADA. Any recently repaved streets or roads in Arlington which lack curb ramps or contain non-compliant curb ramps are in violation of the ADA.

59.    On information and belief, many city streets, roads, and sidewalks have not been altered or repaired since the effective date of the ADA.  Many of these streets, roads, and sidewalks are inaccessible and unsafe for wheelchair users because they contain no curb ramps or non-compliant curb ramps.  These conditions are a result of

Arlington's failure to properly develop and implement a Transition Plan as required by the ADA.

60.     On information and belief, Arlington has also received Federal financial assistance, subjecting it to the requirements of § 504 of the Rehabilitation Act.  To that end, Arlington operates a federally funded paratransit service that requires occupants to execute a liability waiver absolving Arlington of any liability, even for the negligent acts of Arlington employees.  Mr. Frame would like to have the full benefit and use and enjoyment of Arlington's paratransit service, but is unreasonably required to risk his safety to do so.

61.     Arlington has discriminated against the Plaintiffs simply because of their disabilities by denying him them the navigable use and benefit of sidewalks, streets, and intersections within Arlington.  Without accessible curb ramps and side walks, the Plaintiffs will be prevented from undertaking commonplace activities available to those who are fully ambulatory.  Arlington has also discriminated against the Plaintiffs by failing to provide sufficient handicap parking spaces at certain public facilities.

## COUNT I – VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

Plaintiffs reallege each and every allegation contained in paragraphs 1 through 61 above as though fully restated below and further state as follows:

62.     Title II of the ADA prohibits a public entity from excluding persons with disabilities from participating in, or denying the benefits of, the goods, services, programs and activities of the entity or otherwise discriminating against persons on the basis of disability.  42 U.S.C. § 12132.

63.      Pursuant to the mandates of 42 U.S.C. § 12134(a), on July 26, 1991, the Department of Justice, Office of the Attorney General, promulgated federal

regulations to implement the requirements of the ADA.  Those regulations are codified at 28 C.F.R. Part 36, the ADA Accessibility Guidelines ("ADAAG").

64.    The regulations implementing Title II of the ADA, require that when a public entity alters any existing street, road, sidewalk or other facility in any manner that affects usability, the altered portions must be made accessible to and usable by individuals with disabilities 28 C.F.R. § 35.151(b).

65.    These regulations also require a public entity to install curb ramps at intersections whenever it alters sidewalks, streets, roads, and/or highways at anytime after January 26, 1992.  28 C.F.R. § 35.151(e)(1) & (2).

66.    When a public entity resurfaces streets, it affects the accessibility and usability of those streets and appurtenant sidewalks and is therefore an alteration within the meaning of the ADA.  However, Arlington has failed to provide proper curb ramps at several of these altered locations since the effective date of the ADA.  28 C.F.R. § 35.151(b).

67.    A public entity is also required to maintain the features of all facilities which are required to be accessible by the ADA.  28 C.F.R. § 35.133.  Facilities required to be accessible include any portions of buildings, roads, walks, passageways, parking lots, or other real property, including the site where the building is located. 28 C.F.R. § 35.104.

68.    Arlington's practices as set forth above, constitute unlawful and intentional discrimination on the basis of disability, in violation of Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131, et seq., as follows:

     A.    Arlington's failure to properly install or maintain curb ramps when resurfacing streets and altering or installing city sidewalks;

B.      Arlington's failure to install all necessary curb ramps when resurfacing streets and altering or installing city sidewalks;

C.      Arlington's failure to maintain accessible pedestrian rights-of-way by failing to fix abrupt and impassable vertical changes in level, by failing to remove dangerous and excessive cross slopes, and by failing to remove obstacles and protruding objects that narrow and restrict the path of travel;

D.      Arlington's failure to provide a sufficient number of handicap accessible parking spaces or fully compliant parking spaces at certain City buildings, property, or offices;

E.      Arlington's failure to correct architectural barriers to access on accessible routes and entrances to City buildings, property, or offices;

F.      Arlington's failure to properly implement a Transition Plan as required by the ADA and its implementing regulations.  28 C.F.R. § 35.150(d)(1); and

G.      Arlington's failure to implement as part of their Transition Plan, a prioritized schedule for installing curb ramps at existing pedestrian walkways, which have not been installed or altered since the effective date of the ADA, giving priority to walkways serving entities covered by the ADA, including State and local government offices and facilities; transportation, places of public accommodation, and employers, followed by walkways serving other areas.  28 C.F.R. § 35.150(d)(2).

**de la O ▪ Marko ▪ Magolnick ▪ Leyton**
TELEPHONE 305/285-2000          3001 S.W. 3RD AVENUE, MIAMI, FLORIDA 33129          FACSIMILE 305/285-5555

69.    The Plaintiffs who use a motorized wheelchair have repeatedly tried to use public sidewalks, intersections, and streets in Arlington, only to encounter the barriers to access delineated above.

70.    As residents of Arlington, the Plaintiffs have experienced these barriers in the past and will continue to do so in the future as they frequently travel on Arlington's sidewalks, streets, and intersections to various locations, including local restaurants, stores, hospitals, the post office and other government property, buildings, and/or offices.

71.    Arlington's discrimination against the Plaintiffs constitutes an ongoing and continuous violation of the ADA and unless restrained from doing so, Arlington will continue to violate the law.  Unless Arlington's unlawful conduct is enjoined, Plaintiffs will continue to sustain injuries for which they have no adequate remedy at law.  Consequently, Plaintiffs are entitled to injunctive relief pursuant to the ADA, 42 U.S.C. § 12188.

72.    Plaintiffs have been obligated to retain the undersigned counsel for the filing and prosecution of this action.  Plaintiffs are entitled to recover those attorney fees, expert fees, costs and expenses incurred in this case from Arlington.  28 C.F.R. § 35.175.

**WHEREFORE,** Plaintiffs demand judgment against Arlington and request that this Court enter an Order:

A.    Accepting jurisdiction of this case and declare that policies, procedures and services of Arlington are discriminatory and are not in compliance with the ADA;

B.      Requiring Arlington to alter its streets to comply with federal law and regulations to install curb ramps;

C.      Requiring Arlington to install curb ramps at any street intersection that was constructed, resurfaced, restored, and/or rehabilitated within Arlington since January 26, 1992;

D.      Requiring Arlington to alter their sidewalks to make them accessible to and usable by individuals with disabilities to the extent required by Title II of the ADA;

E.      Directing Arlington to evaluate and neutralize their policies, practices, and procedures toward persons with disabilities, for such reasonable time so as to allow Arlington to undertake and complete corrective procedures;

F.      Mandating that Arlington undertake a self-evaluation and that such evaluation contain a description of all Arlington streets, sidewalks, curbs, public parking, public restrooms, and entrances to government buildings with Arlington; a review of all policies and practices that govern the administration of Arlington's streets, sidewalks, curbs, public parking, and entrances to government buildings; and an analysis of whether the policies and practices regarding such administration adversely affect the full participation of and use by individuals with disabilities;

G.      Mandating Arlington to expeditiously make all reasonable and appropriate modifications in their policies, practices and procedures, remove all architectural barriers that are readily achievable, provide alternative means when necessary; and, otherwise, take all such steps as

are reasonable and necessary to ensure that persons with disabilities are no longer excluded, denied services, segregated or otherwise treated differently and discriminated against in Arlington;

H.      Awarding reasonable attorney's fees, expert fees, costs, and expenses to the Plaintiffs;

I.      Awarding such other and further relief as the Court deems necessary, just and proper; and

J.      Retaining jurisdiction of this case until Arlington has fully complied with the orders of this Court.

## COUNT II – VIOLATIONS OF THE REHABILITATION ACT

Plaintiffs reallege each and every allegation contained in paragraphs 1 through 61 above as though fully restated below and further state as follows:

73.     The Plaintiffs are individuals with disabilities.

74.     Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 prohibits discrimination against people with disabilities by recipients of federal funding.  Section 504 provides that "no otherwise qualified handicapped individual…shall, solely by reason of her or his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

75.     Plaintiffs, as City, County, and State residents who do or would like to frequent the businesses and facilities that are currently inaccessible, are otherwise qualified to use the programs, services, and benefits provided by Arlington in the form of City sidewalks, curb ramps, streets, intersections, and handicap accessible parking spaces.

76.     Upon information and belief, Arlington has received Federal financial assistance so as to subject it to the requirement of § 504 of the Rehabilitation Act.

77.     Arlington has excluded the Plaintiffs, solely by reason of their disabilities, from participation in, denied the Plaintiffs the benefits of, and subjected the Plaintiffs to discrimination by failing to provide access to services, programs, and activities.

78.     Arlington is in violation of Section 504 of the Rehabilitation Act by discriminating against the Plaintiffs and other disabled persons, as a result of the following violations:

> A.     Arlington's failure to properly install or maintain curb ramps when resurfacing streets and altering or installing city sidewalks;
>
> B.     Arlington's failure to install all necessary curb ramps when resurfacing streets and altering or installing city sidewalks;
>
> C.     Arlington's failure to maintain accessible pedestrian rights-of-way by failing to fix abrupt and impassable vertical changes in level, by failing to remove dangerous and excessive cross slopes, and by failing to remove obstacles and protruding objects that narrow and restrict the path of travel;
>
> D.     Arlington's failure to provide a sufficient number of handicap accessible parking spaces or fully compliant parking spaces at certain City buildings, property, or offices;
>
> E.     Arlington's failure to correct architectural barriers to access on accessible routes and entrances to City buildings, property, or offices.

F.    Arlington's failure to properly implement a Transition Plan as required by the ADA and its implementing regulations.  28 C.F.R. § 35.150(d)(1); and

G.    Arlington's failure to implement as part of their Transition Plan a prioritized schedule for installing curb ramps at existing pedestrian walkways, which have not been installed or altered since the effective date of the ADA, giving priority to walkways serving entities covered by the ADA, including State and local government offices and facilities; transportation, places of public accommodation, and employers, followed by walkways serving other areas.  28 C.F.R. § 35.150(d)(2).

79.    The Plaintiffs, who each use a motorized wheelchair, have repeatedly tried to use public sidewalks, intersections, and streets in Arlington, only to encounter barriers to access delineated above.

80.    Arlington has discriminated, and continues to so discriminate, against the Plaintiffs by denying them access to, and full and equal enjoyment of one or more of, the goods, services, programs, facilities, privileges, advantages, and/or accommodations by failing to remove substantially all architectural barriers as required by Title II of the ADA, as a result of the violations, *inter alia,* discussed above.

**WHEREFORE**, Plaintiffs demand judgment against Arlington and request that this Court enter an Order:

A.    Accepting jurisdiction of this case and declare that policies, procedures and services of Arlington are discriminatory and are not in compliance with the Rehabilitation Act;

B.      Requiring Arlington to alter its streets to comply with federal law and regulations to install curb ramps;

C.      Requiring Arlington to install curb ramps at any street intersection that was constructed, resurfaced, restored, and/or rehabilitated within the City since January 26, 1992;

D.      Requiring Arlington to alter their sidewalks to make them accessible to and usable by individuals with disabilities to the extent required by the Rehabilitation Act;

E.      Directing Arlington to evaluate and neutralize their policies, practices, and procedures toward persons with disabilities, for such reasonable time so as to allow Arlington to undertake and complete corrective procedures;

F.      Mandating that Arlington undertake a self-evaluation and that such evaluation contain a description of all the Arlington streets, sidewalks, curbs, public parking, public restrooms, and entrances to government buildings within Arlington; a review of all policies and practices that govern the administration of Arlington streets, sidewalks, curbs, public parking, and entrances to government buildings; and an analysis of whether the policies and practices regarding such administration adversely affect the full participation of and use by individuals with disabilities;

G.      Mandating Arlington to expeditiously make all reasonable and appropriate modifications in their policies, practices and procedures, remove all architectural barriers that are readily achievable, provide

alternative means when necessary; and, otherwise, take all such steps as are reasonable and necessary to ensure that persons with disabilities are no longer excluded, denied services, segregated or otherwise treated differently and discriminated against in Arlington;

H.      Awarding reasonable attorney's fees, expert fees, costs, and expenses to the Plaintiffs;

I.      Awarding such other and further relief as the Court deems necessary, just and proper; and

J.      Retaining jurisdiction of this case until Arlington has fully complied with the orders of this Court.

Respectfully submitted,

**DE LA O, MARKO,
MAGOLNICK & LEYTON**
Attorneys for Plaintiffs
3001 S.W. 3rd Avenue
Miami, Florida 33129
Telephone: (305) 285-2000
Facsimile:  (305) 285-5555

By: /s/ Charles D. Ferguson
        **Miguel M. de la O**
        Florida Bar No. 0822700
        delao@dmmllaw.com
        **Charles D. Ferguson**
        Florida Bar No. 0741531
        ferguson@dmmllaw.com
        LEAD COUNSEL
        **MOSELEY · MARTENS, LLP**
        John L. Freeman, Esq.
        State Bar No.  07425500
        John Mitchell Nevins, Esq.
        State Bar No. 14935800
        4949 Hedgcoxe Road, Suite 270
        Plano, Texas 75024-3928
        Telephone: (214) 525-3905
        Facsimile:  (214) 387-9434
        LOCAL COUNSEL

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 9, 2007, a true and correct copy of the foregoing Third Amended Complaint was electronically filed with the Clerk of the Court by using the CM/ECF system, which sends a notice of electronic filing to the following: Kent S. Hofmeister of Brown & Hofmeister, LLP, Counsel for Defendant, 740 East Campbell Road, Suite 800, Richardson, Texas 75081; and Denise V. Wilkerson, Assistant City Attorney, City of Arlington, P.O. Box 90231, Arlington, Texas 76004-3231.

/s/ Charles D. Ferguson
**Charles D. Ferguson**